UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAW FIRM OF LARJACK, PLLC, et al.
Plaintiffs,

v.

CITIBANK, N.A.,
Defendant.

Civil Action No. 21-1592 (JDB)

**MEMORANDUM OPINION**

In this lawsuit, plaintiffs—Law Firm of LarJack, PLLC, ("LarJack") and Steve Larson-Jackson, LarJack's namesake and sole member, Am. Compl. [ECF No. 6] ¶¶ 3–4—seek a declaratory judgment as well as tort damages relating to an overdraft on LarJack's account with defendant Citibank, N.A. ("Citibank"). Pending before the Court is Citibank's motion to compel arbitration and to either dismiss or stay this action. Plaintiffs do not contest that an arbitration agreement was formed between the parties, and the Court finds that this agreement unmistakably delegates all questions of arbitrability to the arbitrator. Accordingly, for the reasons stated below, the Court will grant Citibank's motion to compel and will dismiss this action.

**Background**

On August 17, 2016, plaintiff Steve Larson-Jackson went to a Citibank branch to deposit a $187,700 check from one Daniel Signori into the trust account of Law Firm of LarJack, PLLC. Am. Compl. ¶ 7–9; Am. Compl. Ex. 3 [ECF No. 6]. This transaction, however, did not go smoothly. Shortly after Mr. Larson-Jackson made the deposit, Mr. Signori submitted an Affidavit of Forgery to Citibank to the effect that "he did not know Larson-Jackson or LarJack, that he did not authorize the issuance of the check[] that Larson-Jackson deposited, and that his signature was

1

forged." Am. Compl. ¶ 12; see also Mem. in Supp. of Def.'s Mot. to Compel Arbitration ("Def.'s Mot.") [ECF No. 13-3] at 1. Accordingly, Citibank reversed Mr. Larson-Jackson's deposit, eventually resulting in an overdraft of $187,052.08 on the LarJack account. See Def.'s Mot. at 1–2; Am. Compl. Ex. 4 [ECF No. 6]. Citibank demanded that LarJack deposit funds to cover this deficit, but plaintiffs refused, contending that "neither [Mr. Larson-Jackson] [n]or LarJack did anything to cause an overdraft." Am. Compl. ¶¶ 11–12; see also Def.'s Mot. at 2.

This stalemate persisted for more than three years. Eventually, Citibank "deem[ed] the Overdraft to be uncollectible," cancelled the debt, and filed an IRS Form 1099-C memorializing that cancellation. Def.'s Mot. at 2; see Am. Compl. Ex. 5 [ECF No. 6]. As required by law, Citibank also provided a copy of the Form 1099-C to plaintiffs. Am. Compl. ¶¶ 13–14; Def.'s Mot. at 2; see 26 C.F.R. § 1.6050P-1(f). Yet Citibank's decision was not an unmitigated boon for LarJack, as a cancelled debt is taxable as income. See generally Canceled Debt – Is it Taxable or Not?, Internal Revenue Serv., https://www.irs.gov/taxtopics/tc431 (last updated July 13, 2021). Thus, upon receiving the 1099-C, plaintiffs learned that they were liable for a substantial, unexpected tax burden for tax year 2020. See Am. Compl. ¶¶ 14–15.

In response, LarJack and Mr. Larson-Jackson filed the present lawsuit, asking for a declaratory judgment that the overdraft on the LarJack account "was due to [defendant] and its depositor's negligence," Am. Compl. ¶ 20; that defendant "filed the 1099 C Form[] as a possible means of retribution . . . because [plaintiffs] refused to reimburse [Citibank] for the [overdraft]," id.; and that defendant's "filing of the 1099 C Form was done for an improper purpose and violates the requirements set forth in 26 [U.S.C.] § 108," id. ¶ 18. Plaintiffs also raise intentional and

negligent infliction of emotional distress claims against Citibank,[1] seeking the full amount of the contested overdraft as well as a nearly equal amount of punitive damages, for a total of $374,104.08.  Id. at 8–9.

Citibank countered with the instant motion to compel arbitration.  Specifically, Citibank contends that when Mr. Larson-Jackson opened the LarJack trust account, he signed a "Control Account Application" reflecting his consent "to be bound by any agreement governing any account and service for which I am applying . . . including the terms and conditions of the CitiBusiness® Client Manual," which includes a fulsome arbitration provision.  See Def.'s Mot. Ex. 1 ("Guerrero Decl.") Attach. A [ECF No. 13-5] at 11.[2]

The CitiBusiness Client Manual ("the Client Manual") stipulates that either party may unilaterally "require that any dispute between us, or concerning your Citibank deposit account . . . be resolved by binding arbitration."  Guerrero Decl. Attach. B ("Client Manual") [ECF No. 13-6] at 11.  This provision applies to "[a]ny claim or dispute relating to or arising out of [the] deposit [account], . . . this Agreement, or our relationship,"[3] with the sole exception of "[d]isputes filed . . . in a small claims court."  Id.  The Client Manual's arbitration clauses also specify that "[d]isputes [subject to arbitration] also include claims relating to the enforceability or interpretation of any of

---

[1] Plaintiffs also bring a fourth claim styled simply as "negligence," Am. Compl. at 8, but this claim appears to be identical to their claim for negligent infliction of emotional distress, see id. ¶ 27.  The Court thus construes the complaint to raise only three claims.

[2] Mr. Larson-Jackson, acting on behalf of LarJack, also signed a Business Deposit Resolution which includes a very similar proviso: "The business identified in this Business Resolution . . . acknowledges that all accounts now or hereafter established under this Business Resolution shall be governed by the rules and regulations of Citibank, N.A., . . . including those set forth in the Bank's CitiBusiness® Client Manual, receipt of which is hereby acknowledged."  See Guerrero Decl. Attach. A at 8.

[3] This clause reads "arising out of your deposit, Business Credit account or Business Checking Plus Account . . . ," while the preceding clause discusses "any dispute between us, or concerning your Citibank deposit account, Business Credit account or Business Checking Plus account . . . ."  Client Manual at 11 (emphases added).  Given the nearly identical list in the preceding clause and the fact that "deposit" standing alone makes little sense, the Court will assume that the omission of "account" from the latter clause was unintentional and will interpret the provision accordingly.  This interpretation is ultimately of little consequence, however, as any claims which "arise from or relate to" a deposit account will also a fortiori "arise from or relate to" the parties' "relationship."

3

these arbitration provisions." Id.  Finally, the Manual contains a survival clause, providing that the arbitration provisions "shall survive[] termination or changes to your deposit [account] . . . or any related services we provide."[4]  Id. at 13; see also Def.'s Mot. at 3–5.  Citibank thus argues that, by signing the Control Account Application, Mr. Larson-Jackson and LarJack agreed to the arbitration section of the Client Manual, creating a binding arbitration agreement.  Def.'s Mot. at 2, 10–11.

## Legal Standard

This case is governed by the Federal Arbitration Act ("FAA"),[5] which states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Act then provides that, "[i]f any suit or proceeding [is] brought in [federal court] upon any issue referable to arbitration under a [valid arbitration agreement]," then "the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  Id. § 3.

The Supreme Court has recognized that the FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  Moreover, the Act

---

[4] This clause too omits "account" after "deposit."  As explained above, see supra note 3, the Court will supply the word "account" as the most reasonable interpretation of the clause.

[5] Neither party questions the applicability of the FAA, which applies to "contract[s] evidencing a transaction involving commerce."  9 U.S.C. § 2.  "Commerce" is then defined to include "commerce . . . in the District of Columbia," id. § 1, which the purported agreement here clearly involves.  See Ruiz v. Millennium Square Residential Ass'n, 156 F. Supp. 3d 176, 180 (D.D.C. 2016).

"reflect[s] both a liberal federal policy favoring arbitration[] and the fundamental principle that arbitration is a matter of contract," requiring that "courts place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

"A motion to compel arbitration is decided on a summary judgment standard." Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp., 998 F.3d 449, 456 (D.C. Cir. 2021) ("MEBA") (citing Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008)). "The motion is treated 'as if it were a request for summary disposition of . . . whether or not there had been a meeting of the minds on the agreement to arbitrate.'" Mobile Now, Inc. v. Sprint Corp., 393 F. Supp. 3d 56, 63 (D.D.C. 2019) (quoting Aliron Int'l, 531 F.3d at 865). A motion to compel will thus be granted "only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Slaughter v. Nat'l R.R. Passenger Corp., 460 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)).

The first step in deciding a motion to compel arbitration is determining whether a valid arbitration agreement has been created. See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). To determine if a valid arbitration agreement exists, courts utilize a simple burden-shifting framework. First, "the party seeking to enforce an arbitration agreement . . . ha[s] the burden of proving that [the non-moving party] agreed to arbitrate." Camara v. Mastro's Restaurants LLC, 952 F.3d 372, 373 (D.C. Cir. 2020) (citation omitted). Citibank thus must "present evidence sufficient to demonstrate an enforceable agreement to arbitrate." Ruiz v. Millennium Square Residential Ass'n, 466 F. Supp. 3d 162, 168 (D.D.C. 2020). Then, the burden

"shifts to the party opposing arbitration . . . to establish a genuine issue of material fact as to the making or validity of that agreement." Mobile Now, 393 F. Supp. 3d. at 63 (citing Skrynnikov v. Fed. Nat'l Mortg. Ass'n, 943 F. Supp. 2d 172, 175 (D.D.C. 2013)).

After determining that an agreement was reached, courts must enforce that agreement by its terms, including by giving effect to any "additional, antecedent agreement" delegating threshold questions of arbitrability to the arbitrator rather than the court. See, e.g., Rent-A-Center., West, Inc. v. Jackson, 561 U.S. 63, 70 (2010). Although courts generally "presume that the parties intend courts, not arbitrators, to decide . . . . questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy,'" BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 34 (2014) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)), the parties "'may delegate [such questions] to the arbitrator' if their 'agreement does so by clear and unmistakable evidence,'" Commc'ns Workers of Am. v. AT&T Inc., 6 F.4th 1344, 1347 (D.C. Cir. 2021) (quoting Henry Schein, 139 S. Ct. at 530). If the agreement does contain a "clear and unmistakable" delegation, "a court is prohibited from reaching the gateway question of arbitrability and must reserve that question for arbitral resolution." Andresen v. IntePros Fed., Inc., 240 F. Supp. 3d 143, 149 (D.D.C. 2017) (citing Rent-A-Center, 561 U.S. at 70).

## Analysis

"'[A]rbitration becomes mandatory only by mutual consent of the parties,' and thus 'there must be an agreement between them—interpreted and governed by normal principles of contract law—which provides for arbitration.'" Slaughter, 460 F. Supp. 3d at 6 (quoting 2200 M Street LLC v. Mackell, 940 A.2d 143, 150 (D.C. 2007)). The first question for the Court, then, is whether

6

a contract providing for arbitration was formed between Citibank and plaintiffs Steve Larson-Jackson and LarJack.

The existence of an arbitration agreement is governed by the "ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). There is no dispute—nor could there reasonably be—that the law of the District of Columbia applies here.[6] "In the District of Columbia, when there is a signed, written contract, the signature satisfies the objective test and 'indicates a mutuality of assent to which a party is bound unless he can show some special circumstance . . . .'" Lannan Found. v. Gingold, 300 F. Supp. 3d 1, 26 (D.D.C. 2017) (quoting Watson v. Gold N Diamonds, Inc., 736 F. Supp. 2d 266, 269 (D.D.C. 2010)). And "[a]s a rule, 'one who signs a contract has a duty to read it and is obligated according to its terms.'" Curtis v. Gordon, 980 A.2d 1238, 1244 (D.C. 2009) (quoting Pers Travel, Inc. v. Canal Square Assocs., 804 A.2d 1108, 1110–11 (D.C. 2002)).

In this case, it is uncontested that on April 22, 2014, Mr. Larson-Jackson signed the Control Account Application, thereby creating a contract between plaintiffs and Citibank. See Opp'n to Mot. to Compel Arbitration ("Pl.'s Opp'n") [ECF No. 14] ¶ 1 (conceding that "[w]hen [plaintiffs] opened their account, it created a contract relationship between them [and Citibank]"); Def.'s Mot. at 2–3; Guerrero Decl. Attach. 1 at 11. It is likewise uncontested that this contract incorporated by reference the terms of the Client Manual, including all of its arbitration provisions. See

---

[6] The District of Columbia "has the more substantial interest in having its law applied and the more significant relationship to the litigation." Africare, Inc. v. Xerox Complete Document Sols. Md., LLC, 436 F. Supp. 3d 17, 31 (D.D.C. 2020). In making this determination, courts look to "the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile of the parties." Id. (cleaned up). Here, the alleged act of contracting occurred in D.C., see Guerrero Decl. Attach. 1 at 11 (listing the "Columbia Heights" branch as the location where the account was opened); both plaintiffs are domiciled in the District of Columbia, see id. at 3 (LarJack's Certificate of Organization from the District of Columbia); Am. Compl. at 1 (listing Mr. Larson-Jackson's address in the District of Columbia); and there is no evidence before the Court that plaintiffs ever used the account anywhere other than the District of Columbia. See Am. Compl. ¶¶ 8, 10.

Guerrero Decl. Attach. 1 at 11; see also BP Amoco Corp. v. NLRB, 217 F.3d 869, 874 (D.C. Cir. 2000) ("[W]hen a document incorporates outside material by reference, the subject matter to which it refers becomes part of the incorporating document just as if it were set out in full." (citation omitted)). Thus, plaintiffs' "contract relationship" with Citibank unambiguously subjected "any claim or dispute arising from or relating to . . . [their] relationship" to binding arbitration on the unilateral election of either party. See Client Manual at 11. This is a valid agreement to arbitrate. Cf. Mobile Now, 393 F. Supp. 3d at 64 (finding agreement to arbitrate when party challenging agreement conceded that "it accepted [the movant's] offer . . . and counter-signed the Agreement" and that "it signed the Agreement despite knowing that it contained the dispute resolution [procedure] in question" (internal quotation marks and citations omitted)).

Plaintiffs do not contest the creation of the arbitration agreement and thus raise no genuine issue of material fact as to contract formation. Rather, their sole contention is that the arbitration provision is no longer operative, notwithstanding the agreement's survival clause, because Citibank "unilaterally terminated its contract[] with [them] in either November or December of 2016." Pls.' Opp'n ¶ 3. This argument, however, goes to the enforceability of the arbitration provision and rests on a dispute about the interpretation of the survival clause; it does not challenge the existence of the agreement to arbitrate. Such questions of enforceability and interpretation are explicitly delegated to the arbitrator by the terms of the parties' agreement. See Client Manual at 11 ("Disputes [subject to arbitration] also include claims relating to the enforceability or interpretation of any of these arbitration provisions.").[7]

---

[7] Inexplicably, Citibank utterly neglects this delegation provision, and, were this any other sort of argument, the Court would not hesitate to deem it waived. See, e.g., Doe #1 v. Am. Fed'n of Gov't Emps., Civ. A. No. 20-1558 (JDB), 2021 WL 3550996, at *10 (D.D.C. Aug. 11, 2021) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, and any undeveloped arguments may be deemed waived." (internal quotation marks and citations omitted)). Citibank has not only not "spelled out" this argument—it appears to have missed it altogether, instead "leav[ing] the court to do counsel's work," United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But the

Although gateway questions of arbitrability are usually decided by courts, parties may "'delegate [such questions] to the arbitrator' if their agreement does so by 'clear and unmistakable evidence.'" Commc'ns Workers of Am., 6 F.4th at 1347 (quoting Henry Schein, Inc., 139 S. Ct. at 530). This is just such a "clear and unmistakable" provision: the plain text of the agreement strongly supports the arbitrator's authority to "interpret" the arbitration agreement, and every court to consider this clause has held it to be a clear and unmistakable delegation. See, e.g., Zeevi v. Citibank, N.A., Case No.: 2:19-cv-02206-GMN-BNW, 2021 WL 621423, at *3 (D. Nev. Feb. 16, 2021) ("In the present case, the parties clearly and unmistakably assigned the arbitrability of the arbitration agreement to the arbitrator by expressly delegating disputes including 'claims relating to the enforceability or interpretation' of the arbitration agreement."); De Mello E Silva v. Citibank, N.A., No. 19-23547-CIV, 2020 WL 8115993, at *6 (S.D. Fla. Nov. 6, 2020); Safadi v. Citibank, N.A., No. 12-1356 PSG, 2012 WL 4717875, at *3 (N.D. Cal. Oct. 2, 2012); Ahmed v. Citibank, N.A., No. 19-CV-4439-MKB-SJB, 2020 WL 2988666, at *5 (E.D.N.Y. June 2, 2020); see also Clarke v. Alltran Fin., LP, No. 17-CV-3330 (JFB) (AYS), 2018 WL 1036951, at *8 (E.D.N.Y. Feb. 22, 2018) (provision subjecting to arbitration all "[c]laims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision" was clear and unmistakable).

In addition, plaintiffs' argument that the arbitration agreement has expired is insufficient to avoid the enforcement of this clear and unmistakable delegation. Only a specific challenge to the validity of a delegation provision will stop a court from enforcing it: "If the challenges . . . are

---

Supreme Court has made it clear that, "[j]ust as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." Henry Schein, Inc., 139 S. Ct. at 530; see also AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649–50 (1986). The Court understands this crystal-clear injunction to constitute an exception to the usual principles of waiver.

directed at the 'primary' arbitration clause generally—as opposed to being directed at the delegation provision specifically—the delegation provision must be treated as valid and enforceable and, accordingly, the question of arbitrability must be reserved for an arbitrator." Andresen, 240 F. Supp. 3d at 149 (citing Rent–A–Center, 561 U.S. at 72); see also Mercadante v. XE Servs., LLC, 78 F. Supp. 3d 131, 139–40 (D.D.C. 2015).

The Court is thus obligated by federal law to enforce this delegation according to its terms: "plaintiffs cannot now disavow their bargain to arbitrate all disputes arising under the contract, including the dispute over whether the concededly legitimate arbitration provision continued to control their claims." Haire v. Smith, Currie & Hancock LLP, 925 F. Supp. 2d 126, 133 (D.D.C. 2013) (enforcing a delegation clause and compelling arbitration in case where "plaintiffs concede[d] that . . . the arbitration agreement was valid as executed" and only argued "that the arbitration agreement no longer applied to their claims"). Accordingly, the Court will not pass on plaintiffs' argument that the arbitration agreement is no longer operative, nor will it opine on what claims may or may not be encompassed by the arbitration agreement. Rather, it will simply grant Citibank's motion to compel arbitration at this stage, enforcing the parties' agreement to have questions of interpretation and scope resolved by the arbitrator.

The only question remaining, then, is whether this action will be stayed pending arbitration or dismissed outright. Section 3 of the FAA provides that courts "shall on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3 (emphasis added). The circuits are split, however, on whether § 3 mandates a stay or if it permits a court to dismiss a lawsuit when all of the claims before it are subject to an arbitration agreement. See, e.g., Anderson v. Charter Commc'ns, Inc., No. 20-5894, 2021 WL 2396231, at *4–5 (6th Cir. June 11, 2021) (laying out both sides of the split). The weight of authority is with the pro-dismissal camp:

the "majority of Circuits to address this issue" permit dismissal, Abgara v. AT&T Mobility, LLC, No. 19-CV-1823 (TSC), 2020 WL 674787, at *3 & n.3 (D.D.C. Feb. 11, 2020), and the same is true of cases in this District, see, e.g., Mobile Now, 393 F. Supp. 3d at 72 (dismissing case); Ryan v. BuckleySandler, LLP, 69 F. Supp. 3d 140, 149 (D.D.C. 2014) (same); see also Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1488 (D.C. Cir. 1997) ("For the foregoing reasons, we affirm the District Court's order dismissing the complaint and compelling arbitration."); but see White v. Four Seasons Hotels & Resorts, 999 F. Supp. 2d 250, 262 (D.D.C. 2013) (staying action).  In addition, many courts, including this one, have dismissed cases in which the agreement at issue delegated questions of arbitrability to the arbitrator.  See Haire, 925 F. Supp. 2d at 133–34 (D.D.C. 2013); Gay v. Manchester Mgmt., LLC, No. 3:18-CV-1378-D, 2018 WL 5255267, at *5–6 (N.D. Tex. Oct. 22, 2018); Apollo MD Bus. Servs., L.L.C. v. Amerigroup Corp. (Delaware), Civ. A. No. 1:16-CV-4814-RWS, 2017 WL 10185527, at *5–6 (N.D. Ga. Nov. 27, 2017).

As the arbitration agreement in this case delegates issues of arbitrability to the arbitrator, all remaining disputes in this action are properly before him rather than this Court.  Moreover, plaintiffs made no response to Citibank's request that the Court dismiss the case rather than issue a stay.  See Def.'s Mot. at 11–12.  In light of the weight of authority favoring dismissal—including when enforcing a delegation agreement—the Court will dismiss this action, though it will do so without prejudice in order to permit plaintiffs to refile their suit if consistent with the outcome of the arbitration.

### Conclusion

For the foregoing reasons, the Court finds that the parties entered into a valid arbitration agreement that clearly and unmistakably delegated all questions regarding enforceability and interpretation of the agreement to the arbitrator. Accordingly, the Court will grant defendant's

motion to compel arbitration and will dismiss this action without prejudice. A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: September 15, 2021